IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | |
|---|---|
| DONALD ELIASON | )<br>)<br>) CASE NO. |
| and | ) |
| TODD MOOS, | )<br>)<br>) **CLASS ACTION COMPLAINT** |
| and | ) **(Jury Demand Endorsed Hereon)** |
| VALDIE MAGSTADT, | )<br>) |
| Individually, and on behalf of all others<br>similarly situated, | )<br>)<br>) |
| PLAINTIFFS, | )<br>)<br>) |
| -vs- | )<br>)<br>) |
| GENTEK BUILDING PRODUCTS, INC.,<br>A Delaware Corporation headquartered in<br>Ohio | )<br>)<br>)<br>) |
| and | )<br>) |
| ASSOCIATED MATERIALS, LLC<br>A Delaware Limited Liability Company<br>headquartered in Ohio, | )<br>)<br>) |
| DEFENDANTS | )<br>)<br>) |
| Also Serve: | )<br>) |
| Richard Cordray<br>Ohio Attorney General<br>30 E. Broad St., 17th Floor<br>Columbus, OH 43215 | )<br>)<br>)<br>) |

Named Plaintiffs Donald Eliason, Todd Moos and Valdie Magstadt, individually and on behalf of all others similarly situated, allege on personal knowledge and on information and belief as follows:

## INTRODUCTION

1.      Named Plaintiffs bring this action for monetary damages, declaratory and equitable relief, and/or disgorgement of profits on behalf of themselves and all similarly situated individuals who own exterior aluminum or steel siding manufactured, warranted, advertised and/or sold by Gentek Building Products, Inc. ("Gentek") and/or Associated Materials LLC ("Associated Materials"), or their predecessors or subsidiaries.

2.      The siding at issue herein is warranted by Defendants against cracking, chipping, flaking, peeling or splitting, as well as certain other manufacturing defects.  The warranty remains in effect for the life of the original purchaser, if that purchaser is an individual. If the purchaser is a corporate or governmental entity, the warranty remains in effect for 50 years.  The warranty may be transferred to a subsequent purchaser, in which case it remains in effect for 50 years from the date of the original installation.

3.      The steel and aluminum siding manufactured by Defendants is inherently defective because it begins to peel, chip and crack within the original warranty period. Defendants are obligated by the specific terms of the warranty to either repair, replace or in the case of siding sold in 1995 and thereafter, refinish the siding.

4.      When Defendants receive a claim for peeling paint, they offer the owner either a small monetary sum or the option of having the affected area of the siding repainted.

5.      The monetary sum offered to complaining owners is far less than the cost to make the siding conform to the contract, and significantly less than Gentek's liability under the warranty.

6.      Repainting the siding will not cause the siding to conform to the contract because (1) paint applied after the siding has been installed will not satisfactorily adhere to the siding and (2) repainting only the area which is obviously peeling does not resolve the problem with respect to the remainder of the siding, resulting in the need for multiple repaintings over several years.

7.      Moreover, owners must wait years to have their siding repainted, also in breach of the warranty.

8.      As a result of the defect, and Defendants' breach of the warranty, Named Plaintiffs and thousands of others own inherently defective siding that is failing to perform as warranted and that is not being properly repaired in warranty, and have incurred or will incur thousands of dollars in damages to replace their siding.

## PARTIES

9.      Named Plaintiff Donald Eliason resides in Minot, North Dakota.  He is the owner of siding manufactured by Defendants.

10.      Named Plaintiff Todd Moos resides in Napoleon, North Dakota.  He is the owner of siding manufactured by Defendants.

11.      Named Plaintiff Valdie Magstadt resides in Beulah, North Dakota.   He is the owner of siding manufactured by Defendants.

12.      Defendant Gentek is a Delaware corporation with its principal place of business in Beachwood, Ohio.  Gentek manufactures, warrants, advertises and sells steel,

3

aluminum and vinyl exterior siding to consumers and commercial entities in North America and internationally under the Gentek brand name.  At some times relevant hereto, it did business under the name Alcan Building Products.

13.     Defendant Associated Materials is a Delaware limited liability company with its principal place of business in Cuyahoga Falls, Ohio. Associated Materials is the parent company of Gentek.  It manufactures, warrants, advertises and sells steel, aluminum and vinyl exterior siding to consumers and commercial entities in North America and internationally under the Alside, Gentek, Revere, Ultraguard, Preservation and Alpine brand names.

## JURISDICTION AND VENUE

14.     This court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d), because this is a class action in which (i) there are 100 or more members in the proposed class; (ii) members of the class are citizens of states different from that of Defendants; and (iii) the claims of the proposed class members exceed $5 million in the aggregate.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendants are residents of this District, and because a substantial part of the events or omissions giving rise to the claims occurred within this district.

## CLASS ACTION ALLEGATIONS

16.     Named Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class defined as all owners in the United States of steel and aluminum siding manufactured by Defendants.  Excluded from the Class are Defendants, as well as Defendants' affiliates, employees, officers and directors, including franchised dealers, and any person who has experienced physical injury as a result of the defects at issue in this litigation. Named Plaintiffs reserve the right to amend this Class

4

definition if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

17. The members of the Class are so numerous that joinder of all members would be impracticable. Named Plaintiffs reasonably estimate that there are thousands of Class members who purchased the siding at issue.

18. The members of the Class are readily identifiable from information and records in Defendant's possession, custody or control. The disposition of these claims will provide substantial benefits to the Class.

19. There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual Class members, including, but not limited to, the following:

a. Whether, by the misconduct set forth in this Complaint, Defendant has engaged in unfair or unlawful business practices with respect to the sale of the subject siding.

b. Whether Defendants were aware of the defect in the siding;

c. Whether Defendants attempted to conceal the defect;

d. Whether Defendants' conduct is a deceptive practice as defined at R.C. 1345.02;

e. Whether Defendants have breached the express warranty pertaining to the siding;

f. Whether Defendants have breached implied warranties pertaining to the siding;

g. Whether Defendants have been unjustly enriched by the sale of the siding to Named Plaintiffs and Class Members; and

h. Whether Defendants had a duty to disclose the defect to Named Plaintiffs and Class members.

20. Named Plaintiffs' claims are typical of the claims of the members of the Class. Named Plaintiffs have no interests antagonistic to those of the Class and are not subject to any unique defenses.

21. Named Plaintiffs will fairly and adequately protect the interests of all members of the Class and have retained attorneys experienced in class action and complex litigation.

22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons:

a.  It is economically impractical for members of the class to prosecute separate actions, and to Named Plaintiffs' knowledge, no significant litigation has been commenced by individual class members;

b.  Prosecution as a class action will eliminate the possibility of repetitious litigation; and

c.  A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense and will ensure uniformity of decisions.

## SUBSTANTIVE ALLEGATIONS

23.    The exterior siding at issue here has been manufactured, marketed and distributed by Defendants since at least 1988, both directly to consumers and through Defendants' established network of distributors and contractors.  The siding is sold with what is termed a "Lifetime Warranty".

24.    The Lifetime Warranty that each purchaser receives warrants against the siding containing manufacturing defects which result in cracking, chipping, flaking, peeling or splitting of the paint.   The Lifetime Warranty remains in effect for the life of the original purchaser, if the purchaser is a natural person.  Other purchasers, such as corporations or governmental entities, receive a fifty-year warranty.  In addition, the original purchaser, if a natural person, may transfer the warranty to a subsequent purchaser, in which case the warranty is prorated to fifty years from the original date of purchase.   Said transfer requires the payment of a fee to Defendants.

25.    The warranty given to class members requires that Defendants either repair or replace defective siding, or in the case of warranties given on or after January 1, 1995, repair, replace or refinish the defective siding. If the defect manifests within three years of

6

installation, there is no cost to the owner for work performed pursuant to the warranty.  If the defect manifests after three years, the original owner is required to pay Defendants $100.00 for the service.

26.     If the warranty is transferred to a subsequent purchaser, the amount that purchaser must pay for warranty service is pro-rated over the life of the warranty, as follows:

| Number of Years Claim is made from the original Date of Installation | Percentage of Costs Paid by Gentek |
|---|---|
| 1-5 years | 100% |
| 6th Year | 90% |
| 7th Year | 80% |
| 8th Year | 70% |
| 9th Year | 60% |
| 10th Year | 50% |
| 11th Year | 40% |
| 12th Year | 30% |
| 13th Year | 20% |
| 14th Year through end of warranty period | 10% |

27.     A consumer may reasonably expect steel siding to last a minimum of 50 years, pursuant to a survey of manufacturers, trade associations and product researchers conducted for the National Association of Home Builders (NAHB) Economics Department.[1] Similarly, aluminum siding may be expected to last between 20-50 years.  *Id.*

---

[1] The results of the survey are reprinted at http://www.oldhouseweb.com/how-to-advice/life-expectancy.shtml

28.     Steel and aluminum siding manufactured by Defendants since at least 1988 has contained a substantial defect that causes the paint to peel prematurely.  As a result, thousands of owners have submitted warranty claims to Defendants.

29.     Defendants have been aware of the existence of this defect since at least 2001, and, on information and belief, for a significant period prior to that time, and yet have continued to sell the siding and offer repainting of the siding as a remedy under the warranty.

30.     The increasing cost of future warranty claims was cited as a reason why Alcoa Building Products ended negotiations to purchase Defendant Gentek in 2001.

31.     In November, 2001, Defendant Gentek filed suit against The Sherwin Williams Company alleging that Sherwin Williams had sold it defective paint coatings for application to Gentek's steel and aluminum siding, and that as a result Gentek had, as of that date, received approximately 1,100 warranty claims related to peeling paint on its aluminum and steel siding manufactured after 1988.  The lawsuit was removed to this Court and assigned Case No. 1:02-cv-00013-JRA.   Sherwin Williams ultimately prevailed in that litigation, with no determination made as to which party was at fault for the failure of the paint.

32.     On information and belief, the number of warranty claims relating to peeling paint on siding manufactured after 1988 has continued to increase.

33.     Complaints regarding the siding can be found on several web forums. Below is an example of some of the complaints:

| DATE | SUBSTANCE OF COMPLAINT |
|---|---|
| 9/25/2008 | After 10 years, the paint peels off of the steel siding. Warranty no longer good. Buy anything for your house but Gentek siding. It's crap and you'll be out thousands of dollars to replace it<br><br>Posted by Andres at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_produ cts/1049_mccurdy_rd |
| 10/21/2008 | The worst product I've ever had. Company claims "lifetime warranty" but DOES NOT back the product! My siding is 14 yrs old & the paint is coming off in sheets!<br><br>Posted by Nonmember at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_produ cts/1049_mccurdy_rd |
| 12/10/2008 | We too have Gentek Steel Siding and it is blistering off. I was told by the original installer that supposedly a bad batch of primer was used and that is why it is blistering. Currently one side of our garage is blistering and it will cost $2000 plus to replace. Gentek is paying 10% of that. Wow!This is a defect of their doing and this shouldn't be happening to Steel siding. No way to fix except replace and they don't make that color anymore. Warn your friends.<br><br>Posted by Minnesota Homeowner at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_produ cts/1049_mccurdy_rd |
| 2/16/2009 | We too have the same Gentek siding this is peeling, but ours was only 5+ yrs old and I am thinking about attorney talk. I would not buy anything from them ever again and spread the word about their so called lifetime warranty. We need windows n our house, but we won't be buying them from the company who sold us that steel siding, if they can't back up their siding waranty, how can they back up window warranty.<br><br>Posted by Appleton Wisconsin Homeowner at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_produ cts/1049_mccurdy_rd |
| 5/26/2009 | I PUT GENTEK STEEL SIDING ON MY NEW HOME IN 2004. WITHIN 3 YEARS THE PAINT WAS FADEING AND BLISTERING. NOW IT IS PEELING OFF IN SHEETS. WE HAVE BEEN WORKING TO RESOLVE THE PROBLEM WITH GENTEK FOR OVER A YEAR. THEY CLAIM I HAVE NO RIGHTS AND LEGALLY THEY DON'T HAVE TO REPLACE THE SIDING. THEY SAY THEY DISCONTINUED THE COLOR ALSO. I'VE CONTACTED THE BETTER BUSINESS BUREAU AND THE SOUTH DAKOTA STATES ATTORNEY AND CONSULTED WITH A LOCAL ATTORNEY. I BELIEVE THEY GROSSLY |

|  | MISREPRESENTED THE PRODUCT AND SHOULD PAY TO HAVE THE ENTIRE HOUSE AND SHOP RESIDED WITH A QUALITY STEEL SIDING. DEFINITELY NOT THEIRS<br><br>Posted by Nonmember at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_products/1049_mccurdy_rd |
| --- | --- |
| 7/18/2009 | I have Alside Satinwood Steel siding on my home and garage installed 2001. The siding finish is peeling off at the finished edges due to a manufacturing defect which Alside has known about since I had the installation, and before that time. I have tried to get them to cover my cost to have the siding removed and replaced to no avail. They refuse to even inspect my home. I think they are knowingly selling a defective product to the public with no regard to what happens in the few years to come. their solution is to power wash the problem areas and repaint with exterior house paint . Being a journeymay painter I know the paint will not adhere to the steel.<br><br>They claim to have a warranty but, do not even offer a better solution. Their warranty department gives you a take the paint job or get nothing. They are not in any way consumer friendly. They make a product that is going to fail in a few years regardless of what they claim in their advertisement as to the quality and long lasting of their products.<br><br>I would like to here from any one who hsas had the same defective finish on Alside Steel Siding. Maybe if enough odf us get together we can get them to correct their Rip off. And stop them from selling a defective product to the public.<br><br>Posted by Fighting Mad, Wind Lake, Wisconsin at<br>http://www.ripoffreport.com/Attorney-Generals/Gentek-Building-Prod/gentek-building-products-alsid-aanc2.htm |
| 7/22/2009 | We had Alside Steel Siding (Hawthorne Blue color) installed on our home in Casper WY in 2003 and the paint is peeling bad on two sides and I question whether the rest will eventually peel, also. The color is no longer available I am told. Anyway we have been dealing with Gentek for over a year and today all they are willing to do is have us get somone to paint it. I think since this was obviously defective that the whole house be resided in a quality product. There is no way that anyone can paint with the wood grain look that we have or the price would be more than new siding and regardless whether resided or painted the whole house needs to be done to have it all look decent. Have been disappointed in how long all this have taken and have lost confidence in this company and their products.<br><br>Posted by Karen Whitney at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_products/1049_mccurdy_rd |

| 7/26/2009 | We had Alside Steel Siding installed on our home in 2001 it is chipping and lifting off due to their defective manufacturing process. We have been in contact with them for over a year andall they will do is to repaint it. They say that that is the Only thing they will do. We feel that they should be responsible for selling a defective product and pay for replacement. When you talk to their warranty department they are very pushy as to what they will do and not offer the replacement period. We are sure they knew about this problem and did nothing to correct it, yet kept selling this to the public. Their refinishing also is using regular house paint and only doing the areas that are lifting off, the remaining areas will lift off later so you keep needingto have the house refinished again and agiain. Someone needs too make Gentek replace their defective materials.<br><br>Posted by Nonmember at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_products/1049_mccurdy_rd |
|---|---|
| 9/8/2009 | I have Gentek siding on my home - installed by the previous owner 16 years ago. The paint is peeling in various areas. I do have a warranty but still have to pay a large amount to get the damaged areas replaced. The original siding has been discontinued so I am either left with two different size sidings on my home or pay the full price to get the remainder of my home sided to match. I feel this is a defect and that I should not have to pay anything. When asking Gentek why it is peeling, I never get an answer. I spoke with an attorney and he says the siding company will keep giving you the run around until you give up. I have been dealing with Gentek for 1 year already.<br><br>Posted by Nonmember at<br>http://www.n49.ca/p/kelowna:1120/siding/siding/contractors/gentek_building_products/1049_mccurdy_rd |

34.     The cost of honoring the warranty in the face of the defects contained in their products has caused Defendants to attempt to satisfy warranty claims by offering to repaint the affected area of the siding or pay the owner a small amount of compensation.   Neither of these options satisfies Gentek's liability under the warranty.

35.     The determinative factor in the longevity of paint adhesion is the process used to treat the surface prior to application of the paint.   When steel or aluminum is painted in

the factory, it goes through a multistep process to ensure that the steel or aluminum is in a
pristine state prior to application of the primer.

36.     Typically, the steel or aluminum from which the siding will be fabricated
is shipped to the paint facility in a coil.  The material is uncoiled, and first passes through a series
of pretreatment tanks where aqueous phosphatizing chemicals (for steel) or conversion coatings
(for aluminum) are applied either by immersion or by spray.

37.     The surface is then rinsed multiple times during this process with
deionized or other pure forms of water to ensure that no contaminants remain on the clean
surface,  and then goes through a high temperature oven in order to evaporate all water.

38.     If a primer is needed (which is dependent upon the coating's formulation),
the sheet then goes to the first paint station where a primer is applied.  If needed, and dependent
upon the primer's formulation, the sheet may pass through a baking oven to cure the primer.

39.     The topcoat is then applied, and the sheet goes into a high temperature
oven where it is dried and cured into a hard film.   From here, the sheet is usually wound back
into coil form.

40.     Tight quality control procedures should be conducted in every stage of the
pretreatment and paint process.  This includes measuring the purity of the rinse water, controlling
the concentration of the pretreatment chemicals, measuring the film thickness of the primer and
topcoat, and confirming consistency across the entire length and breadth of the sheet.  Tests are
also performed to confirm excellent adhesion between the coating system and the surface, and to
verify that the coating system complies with physical and chemical performance criteria as
specified or as offered by the paint vendor.

41.     At an appropriate time, the coil is transferred to a fabrication station where it is uncoiled, cut into required or specified lengths, and profiled.

42.     Profiled sheets are then stacked, packaged and ready for shipment to a customer.

43.     In contrast, the refinishing process (as described by Gentek in documents it provides to those who make a claim under the warranty) consists of pressure washing the siding "to remove loose chalk, paint and dirt to provide a clean, uniform surface for coating." Exhibit 1.  Gentek claims that a "specially formulated coating" is then applied to the siding "at a thickness 2-3 times that of the original finish."  *Id.*

44.     Repainting the siding after it has been installed is significantly inferior to the process and quality control procedures used in the factory, for several reasons.   Where peeling paint has exposed the surface, it is impossible to obtain the same degree of cleanliness as that provided in the factory.  Gentek's proposal is to have the siding pressure washed one day and painted the next to allow for drying.  Not only is the water used for pressure washing not deionized, it is likely to be tap water, which contains minerals that can compromise the adhesion and corrosion protection of the subsequent paint system.

45.     Moreover, Gentek's refinishing process does not allow for the application of pretreatment chemicals or a primer.  In addition, a field-applied, air-dried coating does not provide the same superior performance properties as does a factory applied coating that can be baked.

46.     Gentek's refinishing process does not, and cannot, provide the same long term protection that factory applied painting should.

47.     If the remediation coating is applied over the existing factory applied coating, there is no guarantee that the latter will not continue to delaminate from the surface, thus causing it and the remediation coating to peel in the future.

48.     It is also possible that pressure washing the affected area will result in additional damage.  Gentek's explanation of its process, as provided to its customers, does not address the amount of pressure used in the washing process.  The strength of the pressure will determine how much of the paint will be removed.  At low pressure, only paint that has already delaminated from the surface will be removed, whereas at higher pressures, paint that has the potential to fail in the future will also be removed.

49.     If only affected areas of the siding are repainted, there is a potential that color differences between the existing paint and the newly applied paint will become evident after a period of exposure.

50.     Once the siding begins to peel in one area, it is only a matter of time before other areas begin to peel.   Offering owners only the option to repaint visibly peeling areas does not resolve the defect for the remainder of the siding, and often leads to repeated "patch" painting.  In its Complaint against Sherwin Williams, Gentek admitted that as siding that is "susceptible to premature film integrity loss age[s], additional cracks, chips and peels will occur".  Gentek v. Sherwin Williams, Case No. 1:02-cv-00013-JRA, Complaint ¶ 35.

51.     After Defendants inform those who make warranty claims that they will repaint the siding in satisfaction of the warranty, Defendants force them to wait a year or more before the work is actually begun.   Defendants explain this delay to owners as resulting from needing the right weather conditions to be present before the siding can be repainted.   In reality,

it is also because Defendants employ only seven contractors in the entire United States to perform work under the warranty.

52.     To alleviate the costs incurred in repainting, Defendants offer each warranty claimant a small monetary sum in exchange for a release of liability with respect to the affected areas.  In soliciting these releases, Defendants do not inform claimants that the paint surrounding visibly affected areas is also defective and will likely peel within a short period of time.

53.     Named Plaintiff Donald Eliason purchased siding manufactured by Defendants in 1997.  The siding was purchased from and installed by North Country Home Improvement located in Minot, North Dakota.  A copy of Mr. Eliason's warranty is attached hereto as Exhibit 2.

54.     In the spring of 2008, Mr. Eliason noticed that the paint on the white vertical siding on the west gable peak of his house was peeling.  Mr. Eliason contacted Gentek to make a claim under the Warranty.  During that initial contact, Mr. Eliason was told that he would have to complete a self inspection report and submit photos of the damaged area.

55.     On June 13, 2008, Mr. Eliason submitted a Homeowner Self-Inspection Report along with other requested information.

56.     In summer 2008, Mr. Eliason reported to Gentek that paint on the gable on the south side of his home was beginning to peel.

57.     In November, 2008, five months after submitting the required information to Gentek, Mr. Eliason was contacted by Gentek's Warranty Services Department. Gentek offered him the option of either having the damaged siding repainted, or receiving a cash

15

settlement of $216.00.  Both options required the payment by Mr. Eliason of a $100.00 incident charge per the warranty.

58.     On February 15, 2009, Mr. Eliason wrote to Gentek, explained that the peeling problem was getting worse, and requested that it send a representative out to his home to inspect the siding.  Gentek did not do so.

59.     On March 24, 2009, Mr. Eliason called Gentek and reported that the horizontal almond siding under his picture window was cracking and starting to peel.  Gentek offered to repaint that portion of the siding.

60.     On October 9, 2009, Mr. Eliason again contacted Gentek and inquired how much it would cost to remove and install new siding.  Gentek told him it would check for availability of siding that matched the color already installed, and would let him know when someone was available to inspect the siding.  Gentek did not contact him.

61.     On December 18, 2009, Mr. Eliason sent new pictures to the Gentek Warranty Services Department, explaining that he was now seeing additional cracking and peeling problems with the horizontal almond siding on the west side of his house.  Mr. Eliason again requested that Gentek send a representative out to inspect his siding.  Gentek did not do so.

62.     On March 15, 2010, Gentek Warranty Services Department sent correspondence to Mr. Eliason offering to repaint the damaged areas or pay a cash settlement of $500.00.

63.     On April 9, 2010, Mr. Eliason wrote to Gentek's Warranty Services Department and indicated their offers were not acceptable, and that he feared their patch-up repainting would have to be redone repeatedly as time goes by.   With this letter, Mr. Eliason enclosed two estimates he received from third party contractors for repainting the siding.  Those

estimates were for $3,800 and $3,360; neither contractor would offer a guarantee as to how long the paint would last.  Mr. Eliason has received no response from Gentek.

64.     During the time that Mr. Eliason tried to obtain an appropriate offer from Defendants, the condition of his siding grew significantly worse.  The pictures below show the gable on the date he first contacted Gentek (Fig. 1) and the gable as of August, 2010 (fig. 2):




Fig. 1                                                                    Fig. 2

65.     Named Plaintiff Todd Moos purchased siding manufactured by Defendants in 2002.   The siding was purchased from Pinke Lumber Company, Inc. located in Wishek, North Dakota.  Pinke Lumber purchased the siding from Norandex Building Products, an authorized distributor of Defendants.  A copy of Mr. Moos's warranty is attached hereto as Exhibit 3.

66.     In the fall of 2008, Mr. Moos noticed that the paint on the siding was peeling.   He contacted a representative of Pinke Lumber, who agreed to contact the siding representative.

67.     For the next several months, Mr. Moos was told that Pinke Lumber was attempting to reach someone who could resolve the problem on behalf of the manufacturer.

68.     In December of 2009, Mr. Moos received correspondence from Gentek requesting that he complete a "Homeowner Self Inspection Report", and return that along with

photographs, copies of his receipts, and proof that he was the owner of the home.  Mr. Moos returned the information as instructed.

69.     In March of 2010, Mr. Moos contacted Gentek to inquire on the status of his warranty claim.  Gentek told him that it was behind on processing claims, and needed another 30 days before it could respond to him.

70.     In April of 2010, Mr. Moos again contacted Gentek to inquire on the status of his warranty claim, and was again told that Gentek needed another 30 days before it could respond.

71.     On June 24, Gentek offered Mr. Moos the option of either having affected areas of his siding repainted, or receiving payment of $2,900.   Neither of these options was acceptable to Mr. Moos, because the cost of replacing the siding is significantly more than the amount offered by Gentek, and Mr. Moos knows from his experience working with metals that paint applied to installed siding will not last more than a few years.

72.     Since his initial contact with Gentek, the condition of the siding has grown progressively worse, with three walls of his home now affected.   Pictures taken in September, 2010, illustrate the scope of the problem:



73.     Named Plaintiff Valdie Magstadt purchased siding manufactured by Defendants in 2001.  The siding was purchased from Beulah Lumber in Beulah, North Dakota.  Beulah Lumber purchased the siding from Norandex, an authorized distributor of Defendants.  A copy of Mr. Magstadt's warranty is attached hereto as Exhibit 4.

74.     In June, 2008, while out of town, Mr. Magstadt received a call from a neighbor who told him that paint was falling off the siding on his house.  Upon returning home, he contacted Gentek.

75.     On July 31, 2008, Gentek sent correspondence to Mr. Magstadt requesting that he complete a "Homeowner Self Inspection Report", and return that along with photographs, copies of his receipts, and proof that he was the owner of the home.  Within a few weeks of receipt, Mr. Magstadt returned the information as instructed.

76.     In December, 2008, Gentek offered Mr. Magstadt $764.00 in settlement of his warranty claim.  On January 5, 2009, Mr. Magstadt emailed Gentek's representative, stating that he wished to have his siding refinished.  Gentek agreed to do so, and informed Mr. Magstadt that the work would be done during the summer of 2009.

77.     On or about January 9, 2009, Mr. Magstadt paid Gentek $100 for refinishing of the siding.

78.     In May, 2009, Mr. Magstadt received a copy of correspondence sent by Gentek to Green Arrow Contracting, indicating that Gentek had hired Green Arrow to refinish the siding.

79.     During the summer of 2009, Mr. Magstadt contacted Green Arrow several times in an attempt to schedule the repainting.  He was told several times that the contractor would be at his home in "two weeks".   The contractor never began the work.

80.     Mr. Magstadt contacted Gentek on October 5, 2009, and was told that the work would not be done until 2010 and that his house would be given a priority over others on the 2010 schedule.

81.     Mr. Magstadt contacted Gentek in April, 2010 to find out when his siding would be repainted.  Gentek assured him it would be done during the summer of 2010.

82.     In May, 2010, Mr. Magstadt notified Gentek that siding on all sides of his house was now peeling, and had been inspected by a representative of Gentek's authorized distributor.

83.     In June, 2010, Mr. Magstadt obtained the name of the individual believed to be Gentek's supervisor of warranty services.  Upon contacting this person, she purportedly placed a call to the contractor while Mr. Magstadt remained on hold.  During that call, an appointment was made to repaint the siding on July 19, 2010.

84.     The contractor did not show up for the scheduled appointment, and Gentek will not return Mr. Magstadt's calls.

85.     Significant areas of the siding are now peeling, as shown in the following pictures:

 

86.     Named Plaintiffs and Class Members were injured as a result of the conduct described above, including by paying for siding that was worth substantially less than it

would have been had it been as described or warranted, by paying funds to Gentek under the warranty for work that was never done or, if done, is substandard, by incurring expenses in having the siding properly repaired, and by incurring other expenses.

87.     The conduct complained of herein occurred at Defendants' main offices in Beachwood and Cuyahoga Falls, Ohio.

## FIRST CAUSE OF ACTION
## VIOLATION OF OHIO'S CONSUMER SALES PRACTICES ACT

88.     Named Plaintiffs restate the allegations above as if fully rewritten herein.

89.     Named Plaintiffs are "consumers" as that term is defined at R.C. §1345.01.

90.     Defendants are "suppliers" as that term is defined at R.C.  §1345.01.

91.     The transactions in which Named Plaintiffs and Class Members purchased the siding were "consumer transactions" as that term is defined at R.C. §1345.01.

92.     Defendants committed a deceptive act in connection with the consumer transactions at issue herein by failing to honor their warranty.

93.     The courts of Ohio have previously found that a supplier's failure to honor a warranty constitutes a deceptive practice.  *See, e.g., Brown v. Lyons* (1974), 43 Ohio Misc. 14, 332 N.E.2d 380, (Second Dist. 1989)(PIF #10000304); *Teeters Constr. v. Dort*, 142 Ohio Misc. 2d 1, 18 (Ohio Mun. Ct. 2006)(PIF #10002511); *Fisher v. Buckeye Home Improvements, Inc* (Franklin County. C.P. 1993)(PIF #10001352); *Mosley v. Performance Mitsubishi,* Case No. 90CVF214 *(*Fairfield M.C 1992)(PIF #10001326);.  All of the foregoing decisions are available in the Public Inspection file maintained by the Ohio Attorney General.

94.     Defendants committed unfair or deceptive practices in violation of R.C. §1345.02  and O.A.C. 109:4-3-09 by accepting payment for services that were not performed.

95.     The courts of Ohio have previously found that a supplier's act of accepting payment for services and not performing those services is an unfair or deceptive practice.  *See, e.g., State ex rel. Brown v. Herrick*, (Richland County C.P. 1982)(PIF #10000280);  *Brisar v. Parma Builders*, (Cuyahoga C.P. 1987)(PIF #10000872); *State ex rel. Montgomery v. Amerivinyl Window Wholesale Distributors of Dayton, Inc.*(Montgomery County C.P. 1998)(PIF #10002426); *State ex rel. Montgomery v. Anthony* (Stark County C.P. 1999)(PIF #10002425); *State ex rel. Montgomery v. Slasinski*, (Marion County C.P. 2001)(PIF #10002005); *Lascano v. Jones*, (Knox County C.P. 2005)(PIF #10002354); *State ex rel. Petro v. Landon Building Systems, Inc.*(Union County C.P. 2005)(PIF #10002368); *Thomas v. Leaf Genie of Ohio* (Warren County C.P. 2006)(PIF #10002485); *State ex rel. Petro v. Better Plumbers and Home Improvement, Inc.* (Mahoning County C.P. 2006)(PIF #10002497); *State ex rel. Petro v. Vision Home Improvement* (Summit County C.P. 2007)(PIF #10002527); *State ex rel. Dann v. Primax Window Specialist, Inc.* (Allen County C.P. 2007)(PIF #10002594)

96.     The deceptive conduct described above occurred at, and emanated from, Defendants' offices in Ohio.  The warranty is administered by Defendants' employees located within Ohio.

97.     As a result of Defendants' unfair and deceptive practices, Named Plaintiffs and Class Members are entitled to a refund of the full purchase price paid for the siding along with installation costs, together with an injunction prohibiting further violation and other damages as specified in R.C. 1345.09.

## SECOND CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

98.     Named Plaintiffs restate the allegations above as if fully rewritten herein.

99.     The written warranty provides that Defendants warrant against the siding containing a defect that will result in peeling paint and contains a promise that Defendants will repair, replace or refinish the siding if such defect exists.

100.     Defendants have breached the warranty by failing to offer Named Plaintiffs and Class Members a reasonable repair option that will conform the siding to the contract of sale.

101.     Defendants have breached the warranty by refinishing only visibly peeling areas and not resolving the defect for the remainder of the siding.

102.     Defendants have breached the written warranty by failing to act in good faith in choosing to repaint siding instead of replacing it.

103.     Defendants have breached the written warranty by failing to make repairs to the siding within a reasonable amount of time.

104.     Defendants have breached the written warranty by supplying their siding products in a condition which did not conform to the qualities and characteristics that Defendants expressly warranted, and by failing to replace the defective product or refund the purchase price.

105.     The express warranty fails in its essential purpose and, accordingly, Named Plaintiffs and members of the Class cannot and should not be limited to the remedies set forth therein and, instead, should be permitted to recover all measures of appropriate relief.

106.     Defendants have received sufficient and timely notice of the breaches of warranty alleged herein. Despite this notice and Defendants' knowledge of the defect in their products, Defendants have failed and refused to honor its warranty.

107.     Named Plaintiffs and members of the Class have given Defendants a reasonable opportunity to cure their failures with respect to its warranty, and Defendants have failed to do so.

108.     As a result of Defendants' breach of warranty, Named Plaintiffs and members of the Class have suffered damages in an amount to be determined at trial, including compensatory, consequential, and punitive damages.

109.     The limited warranty also purports to limit the remedies available to warranty claimants. Specifically, the warranty disavows any "consequential damages or incidental damages." This limitation is unconscionable and void because:

a.  it is unilaterally imposed in a contract of adhesion, as the parties had unequal bargaining power, and Class members had no opportunity to negotiate its terms;

b.  it excludes damages necessary to remedy the harm caused by a latent defect only known to Defendants;

c.  it does not fall within the reasonable expectations of a purchaser, and unfairly surprises innocent consumers; and/or

d.   this unilaterally imposed limitation results in the allocation of commercial risks in a socially or economically unreasonable manner, because Defendants, sophisticated commercial entities that sold the defective products and that had actual and/or constructive knowledge of the latent defect, are able to transfer foreseeable consequential damages caused by the defect to lay consumer purchasers with no knowledge of the defect.

## THIRD CAUSE OF ACTION
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTIBILITY

110.    Named Plaintiffs restate the allegations above as if fully rewritten herein.

111.    The warranty of merchantability is implied into every commercial transaction. The warranty of merchantability requires that products be of reasonable workmanlike quality and free of defects, and fit for their ordinary use.

112.    Defendants are "merchants" as defined by applicable Uniform Commercial Code ("U.C.C.") provisions and sold siding products to Named Plaintiffs and the Class.

113.    Defendants impliedly warranted to Plaintiffs and the Class that the siding was free of any defect that would cause it to peel within the reasonable expected life of the product, and that it was of reasonable workmanlike quality and fit for its ordinary use.

114.    Named Plaintiffs and the Class were in privity with Defendants in that they purchased their siding from an actual or apparent agent of Defendants, such as Defendants' authorized distributors and/or contractors.

115.    Named Plaintiffs and the Class are also in privity with Defendants by virtue of the contractual relationship stemming from Defendants' manufacturer's warranty provided in conjunction with the purchase of siding or transfer of the structure, which is enforceable by Named Plaintiffs and the Class as against Defendants regardless of where, or from whom, the siding was acquired.

116.    Defendants have breached the implied warranty of merchantability by failing to remedy the defect in the siding within a reasonable amount of time.

117.    Defendants' offer to paint affected siding or pay a small monetary amount is a breach of the obligation of good faith and fair dealing.

118.    Defendants' conduct in selling and marketing defective siding, along with Defendants' failure to disclose to Named Plaintiffs and the Class the existence of the defect, is a breach of the implied warranty of merchantability.

119.    Defendants knew or should have known that the siding contained a defect that caused the paint to peel prematurely and was defective, unmerchantable, and unfit for its intended use or purpose.

120.    Defendants had reasonable and adequate notice of the Named Plaintiffs' and the Classes' claims for breach of implied warranty of merchantability and failed to cure.

121.    As a result of Defendants' breaches of implied warranty, Named Plaintiffs and the Class have been injured and are entitled to equitable/injunctive relief and/or damages in a measure and amount which are to be determined at trial

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT

122.    Named Plaintiffs restate the allegations above, except for paragraphs 84 through 106, as if fully rewritten herein.

123.    During the class period, Named Plaintiffs and Class Members conferred upon Defendants, without knowledge of the defect contained in the siding and the inadequacy of the repainting process, payments for the siding and repairs thereto, all of which constituted benefits to the Defendants which were non-gratuitous, and were conferred with Defendants' knowledge.

124.    Defendants have profited unjustly from those funds, to the detriment of the Named Plaintiffs; and it would be unjust and inequitable to permit Defendants to retain the benefit without compensating Named Plaintiffs and the Class.

## FIFTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

125.    Defendants knew that its siding products were defective in that they were subject to premature peeling of the paint.  Defendants knew this because, by their own admission in their Complaint filed against Sherwin Williams, they had received over 1,100 warranty claims related to the siding at issue as of November, 2001.   In the Complaint, Defendants stated that the defect substantially reduced, if not completely eliminated, the underlying value of the steel and aluminum siding.

126.    Despite their knowledge of the defect, Defendants fraudulently concealed the defect from and/or intentionally failed to disclose the defect to Named Plaintiffs and the Class, both at the time of sale and at the time Named Plaintiffs and the Class contacted Defendants for warranty service.

127.    Defendants were and remain under a duty to Named Plaintiffs and the Class to disclose these facts.   The duty to disclose the defect arises because, as the manufacturers, Defendants are in a superior position to know the true character and quality of their siding products and the defect is latent and not something that Named Plaintiffs and Class Members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

128.    Defendants had a duty to disclose the defect to Named Plaintiffs and Class Members because they actively concealed the defect by failing to make any attempt to notify owners of the defect, despite their own knowledge and the numerous complaints that they received, and by representing to those who made warranty claims that the defect could be repaired by repainting visibly affected areas, when they knew that this was an insufficient repair.

129.    The facts concealed and/or not disclosed to Named Plaintiffs and the Class are material facts in that a reasonable person would have considered them important in deciding whether or not to purchase (or to pay the same price for) the siding, and in considering whether to allow Defendants to repaint defective siding or whether to accept the monetary settlement offered by Defendants.

130.    Defendants intentionally concealed and/or failed to disclose the problems with the siding for the purpose of inducing Named Plaintiffs and Class members to act thereon.

131.    Named Plaintiffs and Class members justifiably acted or relied upon to their detriment the concealed and/or non-disclosed material facts as evidenced by their purchase of the siding, and by allowing Defendants to repaint the siding under warranty or by accepting the monetary settlements offered by Defendants.  Had they known of the true character and quality of the siding Plaintiffs and Class members would not have purchased (or would have paid less for) the siding and would not have allowed Defendants to repaint the siding and would not have accepted the monetary settlements offered by Defendants.

132.    As a direct and proximate cause of Defendants misconduct, Named Plaintiffs and Class members have suffered actual damages.

133.    Defendant's conduct has been and is malicious, wanton and/or reckless and/or shows a reckless indifference to the interests and rights of others.

## SIXTH CAUSE OF ACTION
## INJUNCTIVE RELIEF

134.    Named Plaintiffs hereby incorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

135.    Named Plaintiffs have no adequate remedy at law for future unlawful conduct by Defendants in connection with warranty claims made for peeling paint.

136.    Unless enjoined, Defendants will continue to fail to honor their warranty as described herein.

137.    The continuing nature of Defendants' acts will necessitate a separate action by Named Plaintiffs and each Class member for damages for each act and would subject Named Plaintiffs, each Class member, Defendants, and this Court to the expense, annoyance, and inconvenience of a multiplicity of suits.

138.    For these reasons, the failure of Defendants to uphold their contractual obligations causes irreparable injury to Plaintiff and the Class.

139.    An injunction prohibiting Defendants from continuing to engage in practices found to be deceptive pursuant to R.C. 1345.02 or in violation of express or implied warranties will serve the public interest, and will prevent Defendants from causing further damage to Named Plaintiffs and the Class.

140.    Named Plaintiffs and the Class are entitled to an injunction prohibiting Defendants from continuing to engage in practices alleged herein.

**WHEREFORE**, Named Plaintiffs, on behalf of themselves and all others similarly situated, pray for a judgment against Defendants as follows:

a. For an order certifying the proposed Class herein under Federal Rule of Civil Procedure 23(a) and (b)(3) and appointing Named Plaintiffs and their counsel of record to represent said Class;

b. For an order that Defendants be permanently enjoined from engaging in the unlawful activities and practices complained of herein;

c. For an order awarding restitution and disgorgement of all monies  paid by Named Plaintiffs and the Class Members and/or ill-gotten gains realized by Defendants as a direct result of Defendants' unlawful, deceptive and/or unfair business practices complained of herein;

d. For an order imposing a constructive trust for the benefit of Named Plaintiffs and the Class Members upon all charges paid by Named Plaintiffs and the Class Members;

f. For declaratory relief as this Court deems appropriate;

g. For attorneys' fees and costs of suit, including expert witness fees;

h. For an order awarding pre-judgment and post-judgment interest as prescribed by law;

i. For actual and punitive damages plus interest thereon; and,

j. For such other further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Named Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: September 20, 2010                Respectfully submitted,

                                   ____/s/Barbara Quinn Smith_____

Barbara Quinn Smith (Ohio Bar 0055328)
MADDOX HARGETT & CARUSO
9853 Johnnycake Ridge Road
Suite 302
Mentor, OH 44060
Phone: 440-354-4010
Facsimile: 440-848-8175
bqsmith@mhclaw.com

Thomas K. Caldwell (Indiana Bar 16001-49)
tkcaldwell@mhclaw.com(Pro Hac Vice to be filed)
T. John Kirk (Indiana Bar 27202-29)
kirktjohn@mhclaw.com(Pro Hac Vice to be filed)
MADDOX HARGETT & CARUSO
10100 Lantern Rd.
Suite 150
Fishers, IN 46038
Telephone: 317-598-2040
Facsimile: 317-598-2050

Craig Boeckel  N.D. Bar No. 04625
BOECKEL LAW OFFICE
1506 Galleon Place
Bismarck, ND  58504
Telephone: (701) 400-9054
cboeckel.law@gmail.com
(Pro Hac Vice to be filed).

## DEMAND FOR JURY TRIAL

Named Plaintiffs hereby demand a trial by jury on all claims so triable.

                                  __/s/ Barbara Quinn Smith_____

Barbara Quinn Smith